UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT OWENSBORO


MARTHA R. CROWE                                                    PETITIONER


v.                                              CIVIL ACTION NO. 4:11CV-89-S
                                                CRIMINAL ACTION NO. 4:95CR-13-S


JOE KEFFER, Warden
FMC Carswell                                                       RESPONDENT


## SUPERSEDING MEMORANDUM OPINION


The court entered a Memorandum Opinion and separate Order and Judgment denying the

habeas corpus petition of petitioner Martha R. Crowe on June 25, 2014. Crowe recently filed a

second motion for reconsideration citing a recent opinion from the Fourth Circuit, which also faced

what has become known as the *"Santos* issue."[1] The filing of the motion has given the court the

opportunity to reexamine our memorandum opinion, and we have determined that amplification of

our rationale for the decision is appropriate. The court wishes to more clearly address the issue at

bar, and additionally include some comment on the Fourth Circuit decision. Our ultimate result

remains unchanged. That is, we will deny Crowe's petition for habeas relief under 28 U.S.C. §

2241.

Initially, the court denied Crowe's petition, concluding that

Crowe has failed to come forward with any evidence to link the mailings in Count
1 through 6 with the deposits of money in Liberty Bank in Counts 16 through 22
such that there could be a possible merger problem in this case. Rather she states
generally that "because every completed act of fraud alleged in the indictment as a
'pyramid' or 'ponzi' scheme involves depositing funds derived from predicate

---

[1]The case of *United States v. Santos*, 553 U.S. 507 (2008) is discussed in this opinion at pages 6-8.

offenses so they could be withdrawn to pay early investors to attract new investors..." (Supp.Mem., p. 1) there must be merger with the money laundering offenses. Crowe's argument wholly fails to reference the specific counts of mail fraud charges in the indictment or to address the fact that the acts of mailing appear to bear no relation to the bank deposits in question. The court concludes that Crowe has failed to meet her burden to establish "actual innocence" of any of the charges of conviction. *Wooten*, 677 F.3d 303. Therefore, her petition for habeas corpus under 28 U.S.C. § 2241 must be denied.

DN 48, p. 6.

Crowe moved for reconsideration of the decision. Having successfully argued against the

petition, the United States responded to Crowe's motion in abbreviated fashion,[2] stating that

The payment of monies to earlier investors using funds received from later investors was a fundamental part of Crowe's illegal pyramid scheme, and such payments are of [sic] the subject of the mailings described in the Mail Fraud offenses charged in Counts 1 through 7 of the Indictment. Deposits of monies received from investors into a bank account used by the defendant to carry out the scheme, though this likely proved useful, was not fundamental and essential to the conduct of her illegal pyramid scheme.

DN 46, p. 3. Based upon this language, the court vacated its earlier decision and granted Crowe's

petition for habeas corpus relief, stating, in part:

The court remains convinced that the money laundering charges against Crowe can be distinguished from the charges in the *Crosgrove, Moreland* and *VanAlstyne* cases. However, the United States' response to Crowe's motion for reconsideration articulates a connection between the mail fraud and money laundering that is not apparent from the face of the indictment and cannot be ignored...The United States has indicated that the deposits from investors went into an account used by the defendant to pay out funds to perpetuate the scheme...We are now told that the mailings charged in this case were payments to earlier investors of proceeds obtained from later investors. The deposits of funds obtained from investors into an account which facilitated these payments are charged as money laundering...

DN 53, pp. 3-4.

---

[2]The response consisted of 2 ½ pages, urging, essentially, that Crowe's motion was a rehash of earlier arguments.

The United States moved for relief from the order granting Crowe's petition. Crowe objected to the court's consideration of the United States' motion. However, as we noted that we had given considerable attention to this matter, in an attempt to reach a correct result amidst fractious, and now superseded, caselaw,[3] we did reconsider, and found the existing cases to be distinguishable on their facts.

Upon further consideration of applicable caselaw, the indictment in this case, and the decision of the United States Court of Appeals for the Sixth Circuit affirming the defendants' convictions,[4] the court has determined that our decision to deny Crowe's petition was correct, but some supplementation of our opinion is warranted. The court will incorporate some portions of our prior decisions into this opinion, and we will vacate all previous rulings in favor of this more comprehensive decision.

For the reasons stated herein, the court finds that there is no basis for vacating Crowe's money laundering convictions when the analysis is properly focused on the "concrete details of the particular 'scheme to defraud,' rather than on whether mail fraud generally requires payment of the kind implicated in *Santos*." *United States v. Van Alstyne*, 584 F.3d 815 (9th Cir. 2009). The court will expound upon its analysis at some length below. However, in a nutshell, the court has concluded that the counts of conviction for money laundering in this case do not pose a merger problem, as the jury convicted Crowe of laundering profits of Crowe's Ponzi scheme. As established by *Santos* and its progeny, profits consist of what remains after expenses of the Ponzi

---

[3]As noted in our most recent memorandum opinion, *Santos* was superseded by statute. We must engage in the exercise outlined in *Santos*, as the statute was not given retroactive application.

[4]Martha and David Crowe forfeited their right to challenge their convictions on direct appeal under the fugitive entitlement doctrine. *See* p. 5, *citing* 177 F.3d at 477.

scheme are paid.  *Santos*, 128 S.Ct. at 2027.  Where it is proven that profits are laundered, there will be no possibility of "double counting" transactions in proceeds which are essential to the operation of the scheme.  *Id.*

The United States proved that "[a]s of March 1995, 96,000 participants had paid $43,000,000 to Gold II, which had disbursed $25,000,000.00 in commissions."  *United States v. Gold Unlimited, Inc.*, 177 F.3d 472, 477 (6th Cir. 1999).  The indictment alleged that the defendants ran this Ponzi scheme from November 1991 to March 1995.  The deposits charged as overt acts of money laundering totaled $15,035,298.19.  The seven substantive money laundering counts were deposits listed in those overt acts. This $15 million total is approximately $3 million less than the sum proven by the United States to be remaining in the Liberty Bank account as of March 1995 after commission payments were made to investors.  *Id.*

The Supreme Court noted in *Santos* that

...to establish the proceeds element under the "profits" interpretation, the prosecution needs to show only that a single instance of specified unlawful activity was profitable and gave rise to the money involved in the charged transaction.  And the Government, of course, can select the instances for which the profitability is the clearest...What counts is whether the receipts from the charged unlawful act exceeded the costs fairly attributable to it...An illegal gambling business is an illegal gambling business during each moment of its operation, and it will be up to the Government to select that period of time for which it can most readily establish the necessary elements of the charged offenses, including (if money laundering is one of them) profitability.

*Santos*, 128 S.Ct. at 2029 and n. 7.  Justice Stevens opined in *Santos* as to the concern over merger of offenses, stating that "Allowing the Government to treat the mere payment of the expenses of operating an illegal gambling business as a separate offense is in practical effect tantamount to double jeopardy, which is particularly unfair in this case because the penalties for money laundering

are substantially more severe than those for the underlying offense of operating a gambling business." *Id*. at 2033. The problem thus expressed is not present where an individual is prosecuted for mail fraud involving payments mailed to investors in perpetuation of the fraudulent scheme, simultaneously with charges for laundering profits earned from the scheme. Thus we conclude that in this instance, Crowe's convictions for mail fraud and money laundering may stand.

We explain in some depth below our basis for reaching this decision.


## I. History of the Case

### A. The Criminal Case

The jury convicted the defendants, David and Martha Crowe, and their company, Gold Unlimited, Inc., of mail fraud (counts one through seven), money laundering conspiracy (count fifteen), and money laundering (counts sixteen through twenty two), and it acquitted the defendants of the securities violations (counts eight through fourteen). 177 F.3d at 477.

The defendants were sentenced, and David and Martha Crowe were released on bond pending their date for voluntary surrender to begin service of their sentences. They failed to surrender. Instead, they fled the country. They were re-arrested in July, 2001 and returned to Kentucky. They were indicted and subsequently pled guilty to a charge of failure to appear for which they were sentenced to serve additional time.

The proceedings against Martha Crowe concerning her failure to appear have no relevance to this habeas petition, except to the extent that the Crowes' decision to flee resulted in the 1997 dismissal of their direct appeals of their convictions under the fugitive entitlement doctrine. *Id.* at 478. By fleeing the jurisdiction, the Crowes forfeited their right to challenge any aspect of the trial

proceedings on direct appeal.  The Crowe's corporate entity, Gold Unlimited, pursued an appeal which was unsuccessful.  This court thus cites to the Court of Appeals decision affirming the convictions.

### B.  The § 2241 Petition for Habeas Corpus and the claimed
### Basis for Relief, the *Santos* Decision

This matter came before the court for consideration of the petition of Martha R. Crowe for a writ of habeas corpus pursuant to 28 U.S.C. § 2241. (DN 1).  In 2010, Crowe filed the petition in the United States District Court for the Northern District of Texas, the district of her incarceration. While the matter remained pending, Crowe completed her term of imprisonment and was released from custody.  The matter was then transferred to the Western District of Kentucky, "the convicting court, which maintains jurisdiction over [Crowe's] term of supervised release and in whose jurisdiction [Crowe] resides."  N. D. Tx. Civil Action No. 4:10CV-579, DN 19.

Crowe sought retransfer to the Texas court.  DN 22.  The presiding judge, Joseph H. McKinley, Jr., denied the motion to re-transfer.  He subsequently granted Crowe's motions for recusal and to vacate the denial of the motion for re-transfer.  DNs 38, 41.  This matter was thereafter reassigned to the undersigned,  DN 42, and the motion for re-transfer was subsequently denied a second time.  DN 44.

The parties then filed supplemental memoranda addressing the relevant Sixth Circuit law relating to her petition.  The matter was then submitted for decision.

Because Crowe had already filed, and the court had denied, an earlier petition under 28 U.S.C. § 2255, and leave had not been granted to file a successive petition, she sought relief under the "savings clause" of the statute, § 2255(e), which provides:

> An application for a writ of habeas corpus in behalf of a prisoner who is authorized to apply for relief by motion pursuant to this section, shall not be entertained if it appears that the applicant has failed to apply for relief, by motion, to the court which sentenced him, or that such court has denied him relief, unless it also appears that the remedy by motion is inadequate or ineffective to test the legality of his detention.

Crowe must demonstrate "actual innocence" that is not cognizable in a second or successive petition in order to invoke the savings clause. *Wooten v. Cauley*, 677 F.3d 303, 306-07 (6th Cir. 2012). Crowe urges that an intervening change in the law establishes her actual innocence. *United States v. Peterman*, 249 F.3d 458, 461 (6th Cir. 2001).

Crowe contends that the United States Supreme Court's decision in *United States v. Santos*, 553 U.S. 507 (2008) establishes her innocence of the money laundering charges. In *Santos*, the United States Supreme Court addressed a challenge to Santos' convictions for operating an illegal lottery and for money laundering.[5] The court found that the term "proceeds," as used in the money laundering statute, 18 U.S.C. § 1956, must in some instances be limited to proof of "profits" rather than "receipts" of certain specified unlawful activity in order to avoid the possibility that the same conduct will simultaneously violate two statutes. Such a result was found to create a "merger problem," where one statute (the money laundering statute) radically increases the sentence for a crime such as running an illegal lottery which has been "duly considered and appropriately punished elsewhere in the Criminal Code." *Santos*, 553 U.S. at 517. In the case of Santos' crimes of conviction, the lottery statute provided for a maximum five-year sentence while the money

---

[5] Santos was also convicted of various conspiracy offenses.

laundering statute provided for a maximum sentence of twenty years. Finding no evidence that the transactions upon which the money laundering convictions were based involved profits from the lottery operation, the Supreme Court affirmed the decision of the Court of Appeals to vacate those convictions. Crowe seeks the same relief in the petition before the court.

## C. The Progeny of *Santos*

The concurrence by Justice Stevens in the *Santos* decision rested on a narrower ground than the plurality opinion. Thus Justice Stevens' concurrence stated the rule of law to be applied in this case. Justice Stevens did not embrace the plurality's decision that "proceeds" always means "profits" for any of the hundreds of predicate acts constituting "specified unlawful activity" under the money laundering statutes. He concluded that "the Court need not pick a single definition of 'proceeds' applicable to every unlawful activity..." *Id.* at 525 (Stevens, J., concurring).

The Sixth Circuit, in *United States v. Kratt*, 579 F.3d 558 (6th Cir. 2009), summarized the holding in *Santos*:

> "[P]roceeds" does not always mean profits...; it means profits only when the § 1956 predicate offense creates a merger problem that leads to a radical increase in the statutory maximum sentence and only when nothing in the legislative history suggests that Congress intended such an increase."

*Kratt* also made clear that the term "proceeds" has the same meaning under both § 1956 and § 1957, as both statutes were enacted as part of the Money Laundering Control Act of 1986 and cover the same subject matter in a common way. *Id.*, at 560-61.[6]

---

[6]The defendants in this case were convicted of money laundering under § 1957 and conspiracy to commit money laundering under § 1956(h).

Recently, the Sixth Circuit held that there was no merger problem when mail fraud (§1341) constituted the predicate offense under either a § 1956 or § 1957 charge. The court determined that no risk of an increased sentence existed for the defendant in that instance, as the predicate offense of mail fraud carried a maximum sentence greater or equal to the money laundering offenses. *Jamieson v. United States* Criminal Action No. 09-4376 (6th Cir. Sept. 6, 2012).

The *Jamieson* case does not control in the case before us, however, as the maximum sentence for mail fraud was twenty years at the time of Jamieson's conviction in 2003, but was five years at the time of Crowe's conviction in 1996. Thus in this instance, unlike in *Jamieson*, the court *is* faced with a potential merger problem if the mailings charged in Counts 1 through 7 are indistinct from the money laundering transactions charged in counts 16 through 22 such that proof of one crime would necessarily establish the second crime.

The line of recent cases in which courts have found a merger problem under *Santos* all involved payments of various sorts which were financial transactions charged as both money laundering and mail or wire fraud. For example, in *United States v. Crosgrove*, 637 F.3d 646, 655 (6th Cir. 2011),

> [T]he payments Crosgrove received for his services as an attorney and claims adjuster, which the Government states are the only basis for upholding Crosgrove's conviction for conspiracy to commit money laundering, are also listed in the indictment as overt acts in furtherance of the mail/wire fraud conspiracy. *United States v. Moreland,* 622 F.3d 1147, 1166 (9th Cir.2010)**.** The indictment itself, therefore, reveals the Government's position that the conspiracy to commit mail/wire fraud would, without any additional action by Crosgrove, also constitute a money laundering conspiracy. Crosgrove's charges of conspiracy to commit mail/wire fraud and conspiracy to commit money laundering merge, and the money laundering charge carries a far heavier statutory maximum than the mail/wire fraud charge. Further, we have found nothing in the legislative history to indicate that Congress intended this result for the predicate crime of mail/wire fraud unrelated to narcotics trafficking. Therefore, the profits definition of "proceeds" must apply to this case. Much as payments to the runners in an illegal lottery operation are essential to the

operation of a lottery, and therefore are transactions involving receipts rather than profits, payments to a "claims adjuster" are essential to the operation of a fraudulent insurance scheme. Just as someone has to collect money from lottery participants in order for the lottery to exist, someone must at least purport to represent the claims department of an insurance operation in order for the operation to appear legitimate.

*Accord, United States v. Van Alstyne*, 584 F.3d 803 (9th Cir. 2009)("all of the particular counts of mail fraud for which Van Alstyne was convicted involved transmissions of checks to investors...");

*United States v. Moreland*, 622 F.3d 1147 (9th Cir. 2010)(wire transfers common to the wire fraud and money laundering counts of indictment).

In *United States v. Bush*, 626 F.3d 527 (9th Cir. 2010), the court found no merger problem, noting that "The circumstances surrounding the securities, wire and mail-fraud convictions were all distinct from the money laundering, thus alleviating any merger concerns...[T]he mail-fraud convictions (Counts 15-17) have no connection to the transfers – rather the mail fraud was based on Bush's promotional activities and the sending of false documents to clients..."  *Id*. at 537.

In *United States v. Simmons*, 737 F.3d 319 (4th Cir. 2013), the court was faced with a *Santos* challenge to wire fraud and money laundering convictions in connection with the perpetration of a Ponzi scheme.  Similarly to the other *Santos*-interpreting cases, Simmons's payments to investors were prosecuted as money laundering:

The superseding indictment characterized the wire fraud offense as including transfers to "wire ponzi payment to investors and to intermediaries in other states" – the very transactions that the Government later prosecuted as money laundering.

*Id.* at 326.

The *Simmons* court likened the case before it to *Van Alstyne*, noting that the payment of purported returns to early investors were "inherent" to the defendant's underlying scheme to defraud.  The court concluded in *Simmons* that

> Given this case's similarity to *Santos*, we must decline the Government's invitation to divide Simmons's Ponzi scheme into a successive series of past, present, and future frauds. Rather, *Santos* requires that we hold that Simmons's Ponzi scheme, like the lottery scheme in *Santos*, represented a single, on-going enterprise that the defendant could sustain only by making limited payouts.

*Id.* at 327.


## II.  Analysis

### A.  The Indictment Against Martha R. Crowe

The indictment in this case charged seven mailings for the purpose of executing the Crowes' scheme to defraud.  Counts 1 through 4 each alleged a mailing to an identified individual or business on January 13, 1995.  Counts 5 and 6 each alleged a mailing to an identified individual on January 18, 1995.  Count 7 alleged a mailing on March 7, 1995 to a business.

The indictment charged money laundering under § 1957 in Counts 16 through 22.  Each of the seven counts identified a deposit of money into a Liberty Bank account.  The deposits were made on February 15, 21, and 24 of 1995, and March 6 and 9 of 1995.  Count 15 alleged conspiracy to commit money laundering, reciting 264 overt acts which were deposits made into the Liberty Bank account between February 2 and March 13, 1995.

The money laundering counts alleged that the defendants engaged in and conspired to engage in monetary transactions in criminally derived property that was of a value greater than $10,000.00, in violation of 18 U.S.C. §§ 1957 and 1956(h) respectively.  The term "criminally derived property" means any property constituting, or derived from, proceeds obtained from a criminal offense.  18 U.S.C. § 1957(f)(2).  In this case, the criminal offense from which the proceeds were allegedly derived was mail fraud.

### B. Case Law Comparison

In the mail fraud counts, the indictment charges specific mailings in furtherance of a scheme to defraud. In the money laundering counts, the indictment charges specific bank deposits. The United States has represented that the mailings were commission checks sent to investors in furtherance of the scheme to defraud. The money laundering counts charge numerous deposits into a Liberty Bank account on dates which do not readily correspond to the dates of the mailings. Thus, on its face, it does not appear that the acts of mailing and the acts of depositing bear any relationship to one another. The checks mailed to investors and the deposit of funds into a bank account are clearly distinct transactions. By contrast, the transactions charged in *Crosgrove* and *Moreland*, cases upon which Crowe relies, involved transactions which were charged both as fraud and money laundering.

More specifically, *Crosgrove* involved the perpetration of a fraudulent insurance scheme. In that case, the money laundering counts concerned specific checks deposited by Crosgrove which had been issued to him monthly for pre-established, fixed amounts as salary payments from member fee accounts. Those same check transactions were listed as overt acts in furtherance of the mail and wire fraud conspiracy counts.

The *Moreland* case involved the perpetration of an "enormous pyramid scheme," although the details of this scheme were not described in the court of appeals decision. The court found that certain money laundering and wire fraud counts merged, as both referred to particular wire-transferred commissions to investors.

We find that the case at bar is most similar to the *Van Alstyne* case involving a scheme to sell interests in bogus oil and gas partnerships to targeted individuals. These investors received distribution checks shortly after investing, to induce them to further invest, but the sums they received were essentially the investors' own principal. Transfers of funds into an account of the limited partnerships was charged as money laundering. These transfers for the purpose of making distributions to these investors were simultaneously necessary and essential to the wire fraud scheme, and thus the money laundering and wire fraud charges merged. With respect to one particular transfer, however, the court found that there was no merger. This transfer was made for the purpose of refunding the entire investment to an investor. The court found that the transfer was not in furtherance of nor inherent in the scheme and thus concluded that there was no merger problem with those counts. The court noted in *Van Alstyne* that the analysis required comparison with the specifics of the fraudulent scheme charged, rather than with Ponzi schemes generally.

The United States urged that, while the act of depositing funds into the a bank account used by the defendant to carry out the scheme may have proved "useful" to Crowe, those deposits were not fundamental and essential to the conduct of her pyramid scheme, and were not in fact charged or referenced in the mail fraud counts.

The Ninth Circuit Court of Appeals noted in *Van Alstyne* that:

Mail fraud has two elements: "(1) having devised or intending to devise a scheme to defraud (or to perform specified fraudulent acts), and (2) use of the mail for the purpose of executing, or attempting to execute, the scheme (or specified fraudulent acts)" *Carter v. United States*, 530 U.S. 255, 261, 120 S.Ct. 2159, 147 L.Ed.2d 203 (2000); *see also Bridge v. Phoenix Bond & Indem. Co.,* ___ U.S. ___, 128 S.Ct. 2131, 2138, 170 L.Ed.2d 1012 (2008). The Supreme Court has emphasized that 18 U.S.C. § 1341 prohibits "the 'scheme to defraud' rather than the completed fraud..." *Neder v. United States*, 527 U.S. 1, 25, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999), and that a mailing need only be "incident to an essential part of the scheme" to satisfy the second element. *Bridge*, 128 S.Ct. 2138.

626 F.3d at 814.

The court then went on to explain that issuing checks to investors supposedly representing substantial returns on their investments inspired investors to send more money which could then, in turn, be used to pay more investors. The court noted that this was a central component of the scheme to defraud:

> The very nature of the scheme thus required some payments to investors for it to be at all successful. In sending the January and June distribution checks funded by the money transfer that was charged as money laundering, Van Alstyne "enter[ed] into a transaction paying the expenses of his illegal activity." *Santos*, 128 S.Ct. at 2027 (plurality opinion). Convicting Van Alstyne of money laundering for the bank transfers inherent in the "scheme" central to the mail fraud charges thus presents a "merger" problem closely parallel to the one that underlay the majority result in *Santos*.

*Van Alstyne*, 626 F.3d at 814-15.

The court in *Van Alstyne* stated that "[t]he language [in *Santos*] indicates that our analysis of the 'merger' problem in the mail fraud context must focus on the concrete details of the particular 'scheme to defraud,' rather than on whether mail fraud generally requires payments of the kind implicated in *Santos*." *Van Alstyne*, 584 F.3d at 815. In that case, the court looked critically at three transfers which were charged as acts of money laundering. Two had been made in order to then provide two investors with purported "returns" which the court found were essential to the scheme, as such payments were necessary to induce the investors to make further investments. The third transfer was found by the court not to constitute a crucial element of the scheme to defraud, as this payment was made to reimburse an investor's full investment in satisfaction of his complaints. The court reasoned that the reimbursement did not promote the fraudulent scheme, and thus was a transaction distinct from the mail fraud scheme.

The indictment against Crowe charged a scheme to defraud encompassing the period November 1, 1991 through March 13, 1995, and charging seven particular mailings from January 13, 1995 through May 7, 1995. The money laundering conspiracy encompassed a shorter period from November 1, 1993 through March 13, 1995, specifying 264 overt acts, each constituting a bank deposit made between February 1, 1995 and March 13, 1995. The seven substantive money laundering counts charged bank deposits made between February 15, 1995 and March 9, 1995.

Here, Crowe was charged with acts of mailing to investors in furtherance of the fraudulent scheme described in the mail fraud counts. The acts of depositing monies from investors, charged as money laundering, could potentially constitute acts inherent in the scheme were it not for the United States' proof that the deposits far exceeded the costs, after taking into account the payouts to investors.[7] thus demonstrating that the amounts by which the deposits exceeded the costs were profits.

Crowe contends that the facts in *Van Alstyne* and in *Garland v. Roy,* 615 F.3d 393 (5th Cir. 2010) are indistinguishable from the case at bar. The *Garland* court noted only generally that Garland had conducted a "pyramid scheme," *Id.* at 395. However, the court's decision was based upon its reasoning that "it [was] possible that *the same payout of proceeds as "returns" to investors* formed the basis of the mail and securities fraud convictions, as well proved the element of the money-laundering charge that Garland transacted in "proceeds" of the underlying unlawful activity. *Id.* at 396.

---

[7]Note the distinction in *Van Alstyne* between specific transfers of funds made for the purpose of making certain payments to investors which were found to be inherent in the scheme, and the transfer made to pay a disgruntled investor which did not perpetuate the scheme and was found not to be inherent in the scheme. Further discussion of the issue of receipts vs. benefits can be found in Section C.

We were initially of the view that there was no such risk here, as no "returns" to investors were charged in the money laundering counts.  The language in *Van Alstyne* and *Garland* has convinced this court that this issue does not turn on so narrow a view of the charges.  The gravamen of the crime of mail fraud is the scheme to defraud; the mailing need only be incident to an essential part of the scheme.  The essence of a pyramid scheme is the payment of purported "returns" to earlier investors with funds obtained from later investors, as described in paragraph 4 of the background section of the indictment.  The nature and method of Ponzi schemes is described in general terms in paragraph four of the indictment.  Crowe's scheme is described specifically with respect to the operations of Gold Unlimited in paragraphs 5 through 11.

The United States does not deny that deposits of money generated by a Ponzi scheme are, as a general proposition, inherent in the conduct of the scheme.  There must be deposits of proceeds from which payments to investors are made.  However, deposits into an account used, in part, to further a scheme to defraud, may or may not be used in such a fashion.  By contrast, there is no question that payments made to investors to perpetuate a Ponzi scheme are essential to the scheme and cannot simultaneously be charged as money laundering transactions.  Indeed, the *Simmons* court stated that

> Without these payouts, there would be no investments and consequently, no Ponzi scheme...And Congress itself recognized as much when it amended the money-laundering statute in 2009 to ensure that Ponzi disbursements like the ones at issue here could henceforth be punishable as money laundering.  Simmons's payments to investors, like Santos's payments to lottery winners, constitute essential expenses of his underlying fraud.  Punishing Simmons separately for these payments therefore raises the same merger problem identified in *Santos*.

737 F.3d at 329.

The United States urges that the deposits, while they may have proved useful, were not necessary to the scheme. Such deposits are often made in the perpetuation of Ponzi schemes. But, in this instance, the United States established that far more went in to the account as deposits than was paid out as expenses of running the scheme. Seventeen million dollars more. This sum was, in fact profit, as defined by *Santos*: that is, what remained from the gross receipts after subtraction of the sums paid out to investors as "returns," in furtherance of the scheme.

## C. Receipts vs. Profits

In contrast to the facts of the other cited cases, the indictment against Crowe charges the laundering of $15,035,298.19 in deposit transactions occurring in February and March of 1995 immediately before the scheme was shut down. The United States proved at trial that 96,000 participants had paid $43,000,000.00 to Gold Unlimited over the course of the scheme, and Gold Unlimited had disbursed $25,000,000.00 in commissions by March of 1995. 177 F.3d at 477. Thus the laundered sums charged in the indictment were profits, as they were nearly the sum that remained at the end of the scheme, after accounting for the payouts of commissions to investors.

As noted in *Santos*, the United States was free to select the instances for which profitability was the clearest. The Supreme Court noted that an illegal scheme remains an illegal scheme for each moment of its existence, and the United States may select the period of time for which it can most readily establish that "the receipts from the charged unlawful activity exceeded the costs fairly attributable to it." *Santos*, 128 S.Ct. at 2029. The United States did so in this case by charging deposits made at the end point in the life of the scheme, and proving the amount of payments from investors and the amount of the returns that they received.

The *Santos* case established that payments to participants or investors as returns on investment, to induce further participation or to ensure the continuation of the illegal scheme, are transactions in receipts, not profits. A money laundering conviction based upon transactions in receipts cannot stand where such a conviction would increase the sentence for what is essentially one course of conduct. We read *Santos* as also approving the converse proposition: that profits in the hands of the perpetrator of an illegal scheme are not shielded from prosecution for money laundering, as laundering the profits of a such a crime is not necessary and essential to the fraudulent scheme.

Crowe contends that the $15 million seized in 1995 constituted the "assets" of Gold Unlimited and not profits of an illegal Ponzi scheme. Crowe makes a number of statements concerning the matter of profits.

First, Crowe states that none of the deposits alleged as money laundering transactions occurred outside the time frame of the scheme to defraud. There is nothing in the caselaw requiring acts of money laundering to occur exclusively outside the time frame of the scheme, although such facts were found in a number of cases to distinguish certain payments to investors as not essential to the fraudulent scheme.

Second, Crowe contends that what the United States identified as profits after the payment of commissions was, in actuality, "assets" of the company seized before commissions were paid on the current receipts. The United States shut the scheme down in March of 1995 and proved the amounts taken in, disbursed as commissions, and remaining at that point in time. The Court of Appeals affirmed the convictions on the evidence of record. Crowe cannot revisit her "assets" defense here.

Third, Crowe states that the United States' theory of the case was that the business made no net profits, but rather only made $552,620.00 in gross profits from the sale of gold coins and jewelry, which was spent on expenses such as utilities, salaries, and the purchase of a new building. DN 74, p. 10. However, Crowe recites only the portion of the Court of Appeals opinion with respect to profits from the sale of products. The Court of Appeals in fact stated that:

> Gold's program, ostensibly predicated on the marketing of gold and jewelry, resulted in a gross profit of only $552,620 from sales of gold coin, yet resulted in the intake of $43 million and the disbursement of but $25 million in "commissions."

177 F.3d at 481. The United States successfully established an illegal pyramid scheme, rather than a legal multi-level marketing scheme as urged by the defendants, because the investors earned commissions not by product sales, but through recruitment of other investors.

To summarize, Crowe urges that the deposits charged in the money laundering counts were essential to the carrying on of the fraudulent scheme, and therefore must be found to create a "merger" problem, as outlined in *Santos*. We agree with the premise that deposits of receipts from a Ponzi scheme used to pay commissions or other expenses can be necessary to perpetuation of the scheme. However, in this case, the United States proved that profits of Crowe's Ponzi scheme were laundered in 1995. Thus there was no merger of charges in Crowe's case. This case thus stands in contrast to *Santos* in which "the Government did not try to prove, and respondents [did] not admit[], that they laundered criminal profits." 128 S.Ct. at 2031. *Accord, Crosgrove*, 637 F.3d at 656 ("Crosgrove's pay was not linked to the amount of fees collected, *the value of claims denied, the net receipts after settlement payments, or any other metric that would indicate he was extracting a share of AREA/Noble's profits*...However, no such evidence was presented in this case...")(emphasis ours).

Here, there is no question that the United States charged and proved only an amount constituting profits laundered at the end of the scheme in 1995.

## III.  Conclusion

The *Van Alstyne* case counsels the court to focus on the concrete details of the particular 'scheme to defraud,' rather than on whether mail fraud generally requires payment of the kind implicated in *Santos*.  584 F.3d at 815.  The result we reach today meets the stated purpose of, and stands in harmony with, *Santos* and the cases seeking to apply the *Santos* principle, including *Van Alstyne*.  While it is clear that *Santos* intended to prevent a "radical increase" in sentences for crimes already "duly considered and appropriately punished elsewhere in the Criminal Code," (*Santos*, 128 S.Ct. at 2033), it is equally clear that *Santos* did not intend that mail fraud charges necessarily swallow up legitimate charges of money laundering.  We acknowledge that there are decisions that view the prosecution of money laundering in Ponzi scheme cases as difficult, if not impossible, to justify under *Santos*.  We do not find this case to fall under this principle, for the reasons we have outlined.

Under *Van Alstyne*'s directive, a money laundering conviction cannot stand where the acts of money laundering – in this case, deposits into a bank account used, in part, to pay out proceeds to investors in a Ponzi scheme – are simultaneously necessary and essential to the fraudulent scheme, unless it is proven that the proceeds involved in those money laundering transactions were profits of the criminal activity.  As we have such proof in this case, the court concludes that the petition for habeas corpus is without merit.

The court concludes that Crowe has failed to meet her burden to establish "actual innocence" of the money laundering charges. *Wooten*, 677 F.3d 303. Therefore, the United States' motion for reconsideration of the court's earlier decision must be granted and Crowe's petition for habeas corpus denied. A separate order will be entered this date in accordance with this opinion.

**IT IS SO ORDERED.**

August 21, 2014

**Charles R. Simpson III, Senior Judge**
**United States District Court**

cc: Petitioner, pro se
    Counsel of Record